AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Jacinto CORREA CRUZ | ) | Case No. **CR 22-71066-MAG** |
| | ) | |
| | ) | |
| | ) | |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 12, 2022_____ in the county of _____Monterey_____ in the
_____Northern_____ District of _____California_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841(a)(1) and (b)(1)(B) | Manufacture of, and Possession w/Intent to Manufacture and Distribute, 100 Plants and More of Marijuana |
| | - Max/Min Penalties: Imprisonment 5 yrs (min), 40 yrs (max); Fine $5,000,000 (max); Supervised Release 5 yrs (min), Life (max); Special Assessment $100; Forfeiture; Restitution; Potential Deportation; Denial of Federal Benefits |

This criminal complaint is based on these facts:

See attached Affidavit of Special Agent Cooper Fouch, which is incorporated herein by reference.

☑ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Cooper Fouch, Special Agent, USFS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/12/2022

_____
*Judge's signature*

City and state:     San Jose, California          Hon. Nathanael Cousins, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATION
FOR CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Cooper Fouch, being duly sworn, do hereby swear or affirm:

**I.   INTRODUCTION**

1.      I make this affidavit in support of a criminal complaint charging Jacinto CORREA CRUZ with manufacture of, and possession with intent to manufacture, 100 or more plants of marijuana, a schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(vii).  The facts and information set forth herein are based upon my knowledge and observations, observations of other law enforcement personnel, my review of investigative reports, and information obtained from other federal and state law enforcement officials.  This affidavit is intended to show there is probable cause for the requested complaint and arrest warrant and does not purport to include every fact known to me.  All dates and times herein are approximate.  The information provided in this affidavit is intended to show that there is probable cause to believe that, on or about July 12, 2022, CORREA CRUZ manufactured and possessed with intent to manufacture 100 or more plants of marijuana in the Los Padres National Forest, which are federal lands administered by the United States Forest Service in Monterey County, within the Northern District of California.  Based on this information, I request a criminal complaint and arrest warrant issue for CORREA CRUZ.

**II.  AFFIANT'S TRAINING AND EXPERIENCE**

2.      I am a Special Agent with the United States Forest Service (USFS) and have been since October 2017.  My primary duties include detecting, investigating, apprehending, and prosecuting criminal activity on and relating to National Forest System lands.  As a Special Agent with USFS, I am an investigator and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and therefore am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses of Federal law.

1

3.     Prior to being a Special Agent (SA), I was a USFS law enforcement officer (LEO) for approximately six years. Prior to being a USFS LEO, I was a wildland firefighter with the USFS from 2008 to 2011.  I am a graduate of the Federal Law Enforcement Training Center's Land Management Police Training Program (2011) and Criminal Investigator Training Program (2018).  I have also attended other training courses, including an 80-hour Drug Enforcement Training Program course given by the USFS, which focuses specifically on marijuana cultivation activities on Forest Service Lands.

4.     I have also received on-the-job training and experience.  While employed by USFS, I have conducted numerous controlled substance investigations and have arrested and/or cited many persons for being under the influence, possessing, manufacturing, and transporting various controlled substances and illegal drug paraphernalia.  I have investigated or participated in the investigation of numerous clandestine, outdoor marijuana cultivation sites on federal, state, and private lands.  These marijuana cultivation sites have been in various stages of production.  I have flown marijuana reconnaissance missions with officers and agents who have attended the Drug Enforcement Administration (DEA) Aerial Cannabis Observation School and have spotted marijuana gardens by air. I have also taken part in marijuana cultivation and reclamation operations, along with residential search warrants related to marijuana cultivation investigations.

5.     During the course of my work, I have had the opportunity to employ various investigative tools, including conducting surveillance, conversing with numerous state and federal law enforcement officers, as well as interviewing various witnesses and informants – including drug traffickers and, specifically, outdoor marijuana cultivators – concerning methods by which drug traffickers manufacture, import, transport, distribute, and sell controlled substances.  I have been the affiant on federal search and arrest warrants, and I have testified in federal grand jury sessions and in federal court in cases arising from marijuana cultivation investigations on public land.

AFFIDAVIT

6.     Through my training and experience, I have become familiar with the operations of outdoor marijuana cultivators and the negative impacts that these marijuana cultivation operations have on the environment.  Some of my knowledge is described below.

## III.  BACKGROUND KNOWLEDGE ON MARIJUANA CULTIVATION SITES

7.     Based on my training and experience, and through discussions with experienced narcotics investigators, I know that most large, outdoor marijuana cultivation sites on public lands are operated by larger groups of individuals or organizations that traffic marijuana.  The involvement of such an organization is typically necessary given the significant personnel, logistical, and financial support required for the operation.

8.     Organizations that employ outdoor marijuana cultivation typically start exploring and scouting potential cultivation sites in the late winter and early spring.  This timing is necessary, as these organizations aim to plant marijuana plants as early as possible in the year in order to harvest the plants sooner in the grow season and potentially tend a second crop before it becomes too cold in the late fall and early winter.  In locating cultivation sites, these organizations normally search for areas where snow melts comparatively early in the year, areas near a viable water supply, and areas that are isolated to avoid detection and encounters with recreationalists.  The cultivation operation often involves a main cultivation site that is connected and in close proximity to "satellite" cultivation sites by means of interconnected trails, use of the same "drop point" location, shared campsite(s), or shared equipment and materials.

9.     During scouting excursions, these organizations also attempt to identify "drop points," which are designated locations where drivers can deliver and pick up supplies, equipment, and personnel for the marijuana cultivation operation.  Drop points are typically adjacent to trailheads and/or cultivation sites, and are normally located along a rural route so that the cultivation workers can transport supplies and harvested marijuana between the drop points and cultivation sites on foot.  It is

Affidavit

1  normal to locate a distinct trail system near the drop points.  On most occasions, these organizations

2  prefer to locate their drop points in remote areas where law enforcement and recreational traffic is

3  scarce, in order to avoid detection.

4      10.    Once such an organization identifies possible cultivation sites, the organization engages

5  in procuring needed supplies to prepare the land and locate and set up a water source for the cultivation

6  site.  In many cases, fertilizers, herbicides, pesticides, and irrigation equipment are acquired from

7  various vendors, as well as through illegal sources, such as through smuggled items brought into the

8  United States.  One example is pesticides that are illegal in the United States, smuggled through the

9  border and transported to these sites.  As equipment and supplies for the marijuana grow site are

10  procured, these items are delivered to the marijuana cultivation site, usually at the pre-designated drop

11  points.

12      11.    The land on the marijuana cultivation site is then prepared for planting, watering, and

13  otherwise tending to the marijuana plants.  First, a natural water source needs to be identified in order to

14  establish a watering system for the plants to be planted, grow, and produce.  Once a natural water source

15  is identified, these organizations will tap into that water source, establish a water reservoir, and construct

16  an irrigation system for the purpose of watering these marijuana plants.  As described further below, this

17  diversion of water can have harmful effects on the water supply and surrounding environment.

18      12.    The land then needs to be prepared for planting.  As such, the natural vegetation is cut,

19  removed, or thinned to make space for the marijuana plants – a process that significantly disrupts the

20  native habitat and causes harm to the environment.  After the land has been prepared for planting, the

21  marijuana seeds or plants are placed into the ground.  Fertilizers, herbicides, pesticides, and other

22  chemicals may be used to protect and aid these marijuana plants.  As described below, these chemicals

23  can have serious environmental consequences.  Once the plants begin producing, workers on the sites

24  begin to harvest.  The harvested marijuana is laid out to dry in processing areas within the cultivation

4

1  site(s).  Once the marijuana dries, it is packaged and moved to the drop point for pickup and delivery for

2  further distribution.

3         13.     Throughout the growing season, which typically lasts between three and six months,

4  camps are prepared for "live-in" workers (or, laborers who live on/near the site during its operation)

5  who establish unauthorized occupancy in the cultivation areas.  To sustain this occupancy, and to assist

6  these workers tending to the marijuana plants, various supplies, equipment, and groceries are purchased

7  and delivered by individuals to the grow sites.  These individuals are commonly referred to as the "lunch

8  men."  In addition to delivering needed supplies and transporting workers to and from the designated

9  drop point, the lunch men also retrieve processed marijuana from the marijuana cultivation site.  As the

10  marijuana plants mature during the grow season, more workers will arrive at the cultivation site(s) to

11  help with the labor involved in harvesting and processing the marijuana buds.

12         14.     Upon completion of harvesting the marijuana plants, the sites are abandoned for the

13  season and various materials are left behind, such as pesticides, herbicides, fertilizers, trash, propane

14  tanks, and food items.  These items often attract wildlife, such as bears and other animals that attempt to

15  consume the discarded items.  These by-products of marijuana cultivation site can cause significant

16  harm to the environment and the native wildlife, as well as contaminate nearby water sources, such as

17  creeks and streams.

18         15.     Further, based on my training and experience, I know that individuals illegally operating

19  marijuana cultivation sites often possess weapons – including firearms – in order to protect themselves

20  and the marijuana cultivation site.  This poses a danger to any individuals who approach these

21  cultivation sites on public land (e.g., hikers, campers, and law enforcement), as well as those who may

22  encounter associated individuals during their transport of marijuana or while conducting other activities

23  in furtherance of the cultivation operation.

AFFIDAVIT

## IV.  FACTS ESTABLISHING PROBABLE CAUSE

### *Background Investigation of Ventana Marijuana Cultivation Complex*

16.    In 2020 and 2021, USFS agents and officers conducted an investigation into a large-scale marijuana cultivation complex[1] located on the Los Padres National Forest[2], in Monterey County, California, which is within the Northern District of California (hereinafter, the "Ventana Complex"). The investigation identified six separate marijuana cultivation sites within the Ventana Complex that were actively operating during the 2021 grow season.  All six sites are within close proximity to the Tassajara Creek drainage and accessed by a series of interconnected trails.  The trails leading to these sites originated at a single location, identified by investigators as the Wildcat supply drop point (hereinafter referred to as the Wildcat DP).  The Wildcat DP is a small turnout along a remote portion of Tassajara Road, where the Wildcat trailhead is located.

17.    In 2022, surveillance cameras and license plate readers (LPRs) were installed in the area of the Wildcat DP for further investigation.  Between the dates of March 3 and July 11, 2022, the surveillance cameras captured significantly increasing activity in the area.  For example, on May 4, May 26, June 6, and June 12, 2022, cameras captured vehicles driving to and from the Wildcat DP, as well as personnel walking on nearby trails carrying loads of supplies and equipment and "sweeping" their tracks to conceal them.  Based on my training and experience, the activity captured by the cameras indicated

---

[1] As used in this Affidavit, a marijuana cultivation "complex" generally refers to and is composed of multiple marijuana cultivation "sites" that are interconnected within the same geographic area.  A "site" is composed of multiple "plots" of marijuana, while a "plot" is composed of many "holes," which in turn typically contain several marijuana plants.

[2] The Los Padres National Forest was established in 1978 by the Endangered American Wilderness Act. The Ventana Wilderness region described herein is regularly used by GPS-tagged California condors (*Gymnogyps californianus*), which are listed as endangered under the United States Endangered Species Act of 1973 and listed as critically endangered under the International Union for the Conservation of Nature, Red List of Threatened Species.  Based on the findings of an investigation into a large wildfire that occurred nearby in 2020 (known commonly as the Dolan Fire), the Dolan Fire was directly associated with another illegal marijuana cultivation site in the Los Padres National Forest and was responsible for the death of 11 California condors.

that the marijuana cultivation operation at the Ventana Complex was resuming activity for the 2022 grow season.

18.      On June 21, 2022, Federal Bureau of Investigation (FBI) SA Mary Screen and I flew a reconnaissance mission of the marijuana cultivation complex in a RC-26 airplane operated by the California National Guard (CANG).  The purpose of the mission was to confirm marijuana cultivation activity within the complex.  A camera with forward looking infrared (FLIR) technology was utilized to identify and confirm active marijuana cultivation.  SA Screen and I utilized previously identified GPS coordinates to locate the cultivation sites.  During the reconnaissance mission, we observed that the marijuana cultivation sites that had been identified as active in 2020 and 2021 did not appear to be active yet this season or currently have live marijuana plants growing in them.

19.      During the reconnaissance flight however, we discovered one active cultivation site within the Ventana Complex (hereinafter referred to as the "Zen cultivation site"), which is located at Latitude / Longitude 36° 13.606'N, - 121° 34.608'W and approximately 0.81 miles from the southernmost cultivation site in the Ventana Complex that was active in 2021.   Based on our prior investigation, the Zen cultivation site had been previously identified as an active site in 2018, but not in 2021.  In comparing the footage of this site from my 2021 reconnaissance flight of the Ventana Complex to the footage from my 2022 reconnaissance flight, I observed that a significant change in vegetative and ground disturbance had occurred at the Zen cultivation site between 2021 to 2022.  During my 2022 reconnaissance flight, I noticed a significant clearing of vegetation at the Zen cultivation site and also observed linear patterns of small spots across the landscape, indicating something had been planted in the ground; however, I did not specifically see live marijuana plants at the time.  Based on these facts, along with the photographs of subjects delivering large quantities of supplies along the Wildcat DP trail in May and June of 2022, I believed the Zen cultivation site had recently been planted with live marijuana plants.

7

*Execution of Federal Search Warrant and Arrest of CORREA CRUZ*

20.     On July 7, 2022, the Honorable Virginia K. DeMarchi, United States Magistrate Judge for the Northern District of California, issued a federal search warrant for the Zen cultivation site, along with six other marijuana cultivation sites that had been active in 2021. USFS, along with other federal and state law enforcement agencies, executed the search warrant of these marijuana cultivation sites between July 12 and July 14, 2022.

21.     On July 12, 2022, USFS agents (including myself), along with a California Department of Fish and Wildlife (DFW) marijuana eradication team (MET), conducted a search of the Zen cultivation site. At approximately 0400 hours, the entry team was dropped off and began hiking towards the cultivation site. As the entry team approached closer to the cultivation site, we heard two loud and distinct snapping sounds, which sounded like a .22 caliber rifle being discharged in the distance. Radio traffic confirmed that all personnel on the entry team had heard the firearm being discharged.

22.     As we entered the lower portion of the cultivation site, we observed a "kitchen" area to the immediate right (northwest), which some team members cleared for suspects and weapons. Other members of the team proceeded uphill and to the left, where they found and cleared a camp area. In the process, they located a loaded 9mm handgun and 9mm ammunition in the tent of the camp area (described further below).

23.     As the team continued up the trail into the cultivation site, DFW MET Warden Jason Cobbe observed a male adult, later identified as Jacinto CORREA CRUZ. CORREA CRUZ was wearing a camouflage jacket, camouflage pants, and a camouflage hat. Warden Cobbe could hear digging in the dirt and running water from a hose or irrigation pipe in the direction of CORREA CRUZ.

24.     As Warden Cobbe closed his distance on CORREA CRUZ, he saw that CORREA CRUZ was actively tending to a hole containing marijuana plants. Once Warden Cobbe came with approximately 20 yards of CORREA CRUZ, he observed CORREA CRUZ change his position and look up at him. Warden Cobbe announced his presence in Spanish, identifying himself as a peace officer.

1  CORREA CRUZ immediately began running away from Warden Cobbe, turned left, and jumped over

2  dense brush in an apparent attempt to evade arrest by flight.  After a short pursuit, CORREA CRUZ was

3  apprehended.

4      25.    As described in further detail below, the cultivation area within the Zen site (where

5  CORREA CRUZ was caught actively tending to marijuana plants) comprised of six plots that contained

6  a total of approximately 10,000 marijuana plants.

7                    *Findings from Zen Cultivation Site*

8      26.    During and following CORREA CRUZ's apprehension, the team continued to clear the

9  site and search for any outstanding suspects.  During this search, I located a loaded semi-automatic

10  Mossberg 702 .22 caliber rifle in the vicinity where CORREA CRUZ was seen tending to live marijuana

11  plants before he was arrested.

12      27.    Once the entry team ensured the site was cleared, additional personnel arrived to assist in

13  the search and documentation of the site, including through photographs and video walkthrough. Of

14  note, the following observations were made and items located:

15      a.    The Zen site was approximately one acre in size and consisted of six plots of marijuana

16          plants that were all within immediate vicinity of each other and connected by one main

17          trail.  In these plots, the natural vegetation had been cut and piled in large rows, the soil

18          had been manually terraced, and holes had been dug to cultivate the marijuana plants.

19          Each plot had a large number of irrigation lines running throughout, with small emitter

20          lines running to the holes containing marijuana plants.

21      b.    A water impoundment was located at the top of the site, which was actively sourcing

22          water to the above-described marijuana plots via black irrigation hoses.  This water

23          impoundment, in turn, was being sourced by water actively running into it from further

24          up the mountain.  The impoundment was covered with a tarp to conceal its location.

9

c.    A "day camp" area, consisting of a small, leveled portion of shaded ground with a wooden bench made of branches, was located generally in the middle of the marijuana cultivation plots.  This was the same area where I first located the .22 caliber rifle, which was loaded with a .22 caliber magazine and eight rounds of ammunition.  The rifle, magazine, and ammunition, as well as a knife, were seized from the day camp.

d.    A "live-in camp" area, consisting of a tarp stretched over a tent in heavy brush vegetation, was located downslope from the marijuana cultivation plots and approximately 80 feet from the "day camp" area.  The tent in this camp area was where investigators initially discovered a Smith & Wesson SD9 9mm pistol while clearing the site.  Along with the pistol, investigators found a 16-round magazine with two 9mm Luger ammunition rounds, a .22 caliber magazine, seven .22 caliber ammunition rounds, and an additional 22 rounds of 9mm ammunition.  There were two disheveled sleeping bags in the tent, indicating that there had been two possible occupants in the tent.  Other items found in the tent included common supplies used for marijuana cultivation, such as: marijuana seeds, a green 5-gallon bucket, trimming scissors, green irrigation line emitters, irrigation couplings, two knives, and a digital scale.

e.    A "kitchen" area, which was approximately 100 feet northwest of the live-in camp.  The kitchen consisted of a leveled portion of land, with a stick structure and tarp stretched over to create a roof.  Inside the kitchen were various cooking and food supplies, as well as more marijuana cultivation supplies, including green irrigation emitters, irrigation couplings, irrigation shutoff valves, trimming scissors, pruning tools, a digital scale, and additional marijuana seeds.  Additionally, investigators found animal parts hanging from the kitchen structure—including four fawn deer feet, two rabbit feet and two rattle snake rattles—which appeared to have been harvested within the last few months.

28.     Further, scientists from the Integral Ecology Research Center (IERC) documented environmental damage at the Zen cultivation site. Toxicological sampling of the soil, marijuana plants, and infrastructure on the site confirmed the presence of six different toxic pesticides. Of significance, toxicology screening indicated widespread contamination across the site with carbofuran, which is a highly toxic insecticide that is banned from any legal use in the United States due to its known harm to humans and the environment. Specifically, carbofuran is considered one of the most acutely toxic pesticides ever used on agricultural crops in the United States and can be fatal to humans in amounts as small as 1/4-teaspoon. It is also particularly hazardous to birds and was linked to millions of bird deaths per year prior to its ban in 1991 by the United States Environmental Protection Agency. During the environmental assessment of the Zen cultivation site, carbofuran was found in the soil throughout the one-acre cultivation plot, within all sections of the irrigation infrastructure throughout plot, and within the backpack pesticide sprayers located on the site, which were apparently used to apply pesticides to the growing marijuana plants.

29.     The Zen cultivation site was also contaminated with methamidophos, which is another banned pesticide, as well as several restricted-use pesticides, including zinc phosphide (a fumigant rodenticide), diphacinone (an anticoagulant rodenticide), and malathion (an insecticide). Of note, the IERC team found evidence that the site used at least 45 pounds of diphacinone, which is known for the exposure and poisoning deaths of sensitive and endangered species throughout California. In these amounts, the risk to all species of wildlife, including California condors, can be devastating, especially through secondary poisoning of condors consuming animals that died from rodenticide poisoning.

30.     Environmental contamination with pesticides also poses a large risk to wildlife habitats, abiotic media (soil and water), and potentially downstream communities or recreation facilities using water flowing from these sites. Based on research by the IERC, pesticides applied within marijuana cultivation sites, particularly those applied to soil, are capable of being transported to contaminate

AFFIDAVIT

downstream waterways and may put human communities at risk. The tributary on which the Zen site is located drains to Tassajara Creek, which is used as a potable and recreational water source for rural communities nearby, including a resort located downstream.  In addition, the clearing of native vegetation and manual grading of the landscape imposed by the marijuana cultivation activities at the Zen site increases erosion and sedimentation risk to the watershed, which lowers the water quality and habitat potential for sensitive aquatic species in Tassajara Creek and lower watersheds.  The site was also diverting water from an unknown surface water source to irrigate its marijuana plants, thereby dewatering a natural spring or stream in some of the headwaters of the Tassajara drainage.

31.     Due to the level of hazardous chemicals present at the time of the search operation, it was not safe for personnel to eradicate the marijuana plants within the grow.  In lieu of obtaining a marijuana plant count via an eradication operation, we counted the number of holes on the site that contained marijuana plants in order to obtain a minimum plant count.  Based on a total count of 2,393 holes (each containing approximately 5-7 live marijuana plants), we reached a conservative estimate of approximately 10,000 live marijuana plants growing within the Zen cultivation site.

## V.   CONCLUSION

32.     Based on the foregoing, I submit there is probable cause to believe that Jacinto CORREA CRUZ violated Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(vii), manufacture of, and possession with intent to manufacture and distribute, 100 or more plants of marijuana, a schedule I controlled substance.  Therefore, I request that the Court issue an arrest warrant and criminal complaint charging Jacinto CORREA CRUZ with this violation.

33.     Because this investigation is continuing, disclosure of the complaint, my affidavit, this application, and the attachments thereto would jeopardize the progress of the investigation and potentially endanger the agents and confidential sources working on the investigation. It may also cause the defendant's co-conspirators to flee and/or destroy evidence. Accordingly, I request that the Court

AFFIDAVIT

1   seal the application, this affidavit, the complaint and supporting papers, except that copies of these

2   documents may be provided to the United States Attorney's Office and law enforcement agencies for

3   use in connection with this case.

4          34.    I swear under penalty of perjury that the facts presented are true and accurate to the best

5   of my knowledge.

6                                                    /s/ Cooper Fouch
7                                                    Cooper Fouch
8                                                    Special Agent
9                                                    United States Forest Service
10
11  Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on
12  this _____ day of August 2022.
13
14
15
16  HON. NATHANAEL COUSINS
17  UNITED STATES MAGISTRATE JUDGE

13

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT ☐ INFORMATION ☐ INDICTMENT

☐ SUPERSEDING

### OFFENSE CHARGED

21 U.S.C. §§ 841(a)(1) & (b)(1)(B)(viii) - Manufacture and Possession with Intent to Manufacture and Distribute 100 Plants and More of Marijuana

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Imprisonment 5 yrs (min), 40 yrs (max); Fine $5,000,000 (max); Supervised Release 5 yrs (min), Life (max); Special Assessment $100; Forfeiture; Restitution; Potential Deportation; Denial of Federal Benefits

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

### DEFENDANT - U.S

▶ JACINTO CORREA CRUZ

DISTRICT COURT NUMBER

## CR 22-71066-MAG

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

_____

☒ person is awaiting trial in another Federal or State Court, give name of court

Superior Court of California, Monterey County

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

_____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:        SHOW DOCKET NO.

   ☐ U.S. ATTORNEY  ☐ DEFENSE }

☐ this prosecution relates to a pending case involving this same defendant     MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under }

Name and Office of Person Furnishing Information on this form    STEPHANIE M. HINDS

☒ U.S. Attorney ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)    ANNE C. HSIEH

### DEFENDANT

**IS NOT IN CUSTODY**

1) ☐ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

_____

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction } ☐ Federal ☒ State

6) ☒ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution
Monterey County Jail

Has detainer been filed?  ☐ Yes  } If "Yes" give date filed
            ☒ No

**DATE OF ARREST** ▶    Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶    Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS ☐ NO PROCESS* ☒ WARRANT    Bail Amount: No Bail

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

_____

Date/Time: _____    Before Judge: _____

Comments: